488 So.2d 385 (1986)
Kenneth DUCOTE, Plaintiff-Appellee,
v.
STATE FARM FIRE & CASUALTY INSURANCE COMPANY, et al., Defendant-Appellant.
No. 85-537.
Court of Appeal of Louisiana, Third Circuit.
May 14, 1986.
*386 Gist, Methvin, Hughes & Munsterman, Dewitt T. Methvin, Jr., Alexandria, for defendant-appellant.
Eugene P. Cicardo, Sr., Alexandria, for plaintiff-appellee.
Before STOKER and KING, JJ., and COX, J. Pro Tem.[*]
KING, Judge.
The main issue presented by this appeal is whether or not the trial court erred in finding that a five-foot aluminum step-ladder, from which the plaintiff fell, created an unreasonable risk of harm to plaintiff.
Kenneth Ducote (hereinafter referred to as plaintiff) filed suit against Abby Blalock (hereinafter referred to as Blalock) and Blalock's homeowner insurer, State Farm Fire & Casualty Company (hereinafter referred to as State Farm), to recover damages that he sustained when he fell from an aluminum step-ladder which was in the custody of Blalock and was on Blalock's property. From a trial court judgment in favor of plaintiff, State Farm suspensively appeals. We reverse.

*387 FACTS
The facts involved in this case are basically undisputed. On the morning of March 7, 1983, plaintiff drove to the home of his friend, Blalock, who was at that time roofing a new shed he had constructed on his property separate from his house. In describing plaintiff's arrival and subsequent accident, Blalock testified at trial that:
"I had been up on the shed. I had packed some shingles up there, a number of bundles up, and I started to put them on. Well, when I ran out of shingles ... I ran out at the same time Kenneth was pulling [up] in the yard, so ... and I was tired of roofing anyway, so I told him, I said, `You're just in time.' I said, `I'm out of shingles'. I was coming down `cause I had made some coffee and so, you know, he had stated that just hang on and he'd hand me a bundle up, so I said, `Okay.' Well, that's when he started up the ladder with the bundle and I hadn't come to that end yet to get them or nothing from him but I just ... as he came up the ladder, I just saw him fall. He just went out of sight from where I was standing."
Plaintiff had consumed several beers before arriving at Blalock's home and testified that he couldn't remember exactly what was said to him before he put down a beer he was drinking, picked up a bundle of shingles, and started up the step-ladder. Plaintiff stated that he had climbed as high as the second or third step of the step-ladder, and that:
"[I] had both feet on one step and I had a bundle of shingles on my lefthand shoulder and I was holding the ladder near the top or on the top with my right hand and the ladder just started shaking and I didn't know what happened and I couldn't steady it and the next thing I remember was I was laying on the ground with the shingles still on my shoulder and the ladder was broke then."
The five-foot aluminum step-ladder, from which plaintiff fell, had been borrowed by Blalock from his father a couple of months prior to the accident and was in Blalock's custody. Blalock testified that he had used the ladder many times, and never had a problem with its use. The ladder contained no apparent observable defects on the day that plaintiff fell, and it also had a readily visible label attached to it which contained the following wording: "Sears Step Ladder, Household Duty, For Occasional Light Household Use and Lightweight Climbers. Meets AMSI Specification Standards." Plaintiff testified that at the time of the accident, he weighed about 140 pounds and that the bundle of shingles that he attempted to carry up the ladder weighed approximately 65 to 75 pounds. As a result of the fall, plaintiff fractured one of the bones in his right wrist, and was required to wear an arm cast for approximately two months.
On February 29, 1984, plaintiff filed suit against Blalock[1] and his insurer, State Farm, under a homeowner's insurance policy which it had issued to Blalock, seeking recovery of damages in tort and strict liability for medical expenses, physical and mental injury, and lost wages that he sustained as a result of the accident.
On motion of State Farm, the case was tried before a jury. Plaintiff and State Farm jointly stipulated that Blalock was insured by State Farm at the time of the accident. During the trial, the trial judge informed the attorneys for both parties that he was not going to charge the jury on the issue of negligence since he did not believe, under the evidence presented, that there was any issue of Blalock's personal negligence but only an issue of strict liability arising from whether or not the step-ladder caused an unreasonable risk of harm to plaintiff. After the close of the evidence, the jury rendered the following verdict on Special Interrogatories on January 16, 1985:
*388
 " 1.
 DO YOU FIND THAT THE LADDER IN QUESTION
 CREATED AN UNREASONABLE RISK OF HARM
 OR INJURY TO KENNETH DUCOTE? Yes X No_____
 IF THE ANSWER IS YES, GO TO THE NEXT QUESTION.
 IF THE ANSWER IS NO, STOP, HAVE THE
 FOREMAN SIGN THE VERDICT FORM AND RETURN
 TO BAILIFF.
 2.
 DO YOU FIND THAT THE LADDER IN QUESTION
 WAS IN THE CARE, CUSTODY AND CONTROL OF
 THE DEFENDANT, ABBY BLALOCK? Yes X No_____
 IF THE ANSWER IS YES, GO TO THE NEXT QUESTION.
 IF THE ANSWER IS NO, STOP, HAVE THE
 FOREMAN SIGN THE VERDICT FORM AND RETURN
 TO BAILIFF.
 3.
 DO YOU FIND THAT THE PLAINTIFF, KENNETH
 DUCOTE, HAD KNOWLEDGE AND APPRECIATION
 OF THE DANGER AND VOLUNTARILY ENCOUNTERED
 IT? Yes X No _____"
On January 28, 1985, pursuant to the jury verdict, a judgment was signed by the trial judge in favor of defendant and against plaintiff, rejecting plaintiff's demands at his costs, and fixing expert witness fees at $150.00 for each expert and taxing these fees as costs. At the same time, on January 28, 1985, a Motion For Judgment Notwithstanding The Verdict was filed by plaintiff. Pursuant to this motion, the trial judge vacated the judgment in favor of State Farm, finding that plaintiff had not assumed the risk of being injured while climbing the ladder, and rendered judgment notwithstanding the verdict in favor of plaintiff and against State Farm, awarding plaintiff $20,000.00 in general damages and $1,800.00 in lost wages together with legal interest from date of judicial demand, until paid, and all court costs. A written judgment to this effect was signed on March 19, 1985, but the written judgment also increased the expert witness fees to $200.00 for each expert and taxed these fees as costs.
State Farm filed a motion for a new trial, from the trial court's granting of the judgment notwithstanding the verdict, which was denied by the trial court. State Farm then timely filed this suspensive appeal contending that the trial court erred in:
(1) Finding that the step-ladder involved in the accident was defective;
(2) Concluding that a defective condition in the step-ladder caused plaintiff's injury;
(3) Failing to submit the issues of negligence and contributory negligence to the jury;
(4) Granting plaintiff's Motion for Judgment Notwithstanding the Verdict; and
(5) Failing to grant its motion for a new trial after the granting of the judgment notwithstanding the verdict.

FINDING OF DEFECT IN STEP-LADDER
State Farm's first contention on appeal is that the trial court erred in granting a judgment notwithstanding the verdict by finding that the five foot aluminum step-ladder from which plaintiff fell was defective. The jury found, in answer to Special Interrogatory Number 1, that the ladder created an unreasonable risk of harm or injury to plaintiff. The trial judge did not *389 disturb this finding in granting judgment notwithstanding the verdict, but merely overruled the jury's finding that plaintiff had knowledge and appreciation of the danger and voluntarily encountered it.
As previously mentioned, the jury verdict and the trial court judgment notwithstanding the verdicts were both based on Blalock's custody of the allegedly defective five foot aluminum step-ladder. The Civil Code article upon which the liability of State Farm's insured, Blalock, was based is LSA-C.C. Art. 2317, which provides that:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications." LSA-C.C. Art. 2317.
For recovery under LSA-C.C. Art. 2317, a plaintiff must show: (1) that the thing which caused the injury was in the care or custody of the defendant; (2) that a vice or defect existed in the thing; and (3) that the vice or defect caused the injury. Gonzalas v. Louisiana Power and Light Company, 487 So.2d 1254 (La.App. 3rd Cir.1986); Varnado v. Sanders, 477 So.2d 1205 (La.App. 1st Cir.1985), writ den., 481 So.2d 630 (La.1986); Tischler v. City of Alexandria, 471 So.2d 1099 (La.App. 3rd Cir.1985); Lewis v. Oubre, 461 So.2d 523 (La.App. 3rd Cir.1984), writ den., 465 So.2d 735 (La.1985); Loescher v. Parr, 324 So.2d 441 (La.1975). In Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986), the Louisiana Supreme Court discussed recovery under a theory of strict liability by stating:
"A. Codal principle of legal fault or strict liability
A principle of legal fault or strict liability underlies articles 2317-22 of the Civil Code: When harm results from the conduct of a person or defect of a thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The injured person must prove the vice (i.e., unreasonable risk of injury to another) in the person or thing whose act causes the damage, and that the damage resulted from this vice. Once this is proved the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force. Loescher v. Parr, 324 So.2d 441 (La. 1975).
The strict liability or legal fault thus arising from our code provisions is more than a rebuttable presumption of negligence. The owner or guardian cannot be absolved from his strict liability even if he proves that he did not know and could not have known of the unreasonable risk of harm to others. See Loescher v. Parr, supra. (A tree owner is responsible for damage caused by the tree's fall although he could not reasonably have known of its internally diseased condition. C.C. Article 2317); Holland v. Buckley, 305 So.2d 113 (La.1974). (A dog owner is strictly liable for injury done by the animal's first bite even if he could not have known of the dog's harm-causing characteristic. C.C. 2321); Turner v. Bucher, 308 So.2d 270 (La. 1975). (A parent is strictly liable for damage caused by his child's defective conduct regardless of the fact that the parent could not have prevented the child's act. C.C. 2318); Olsen v. Shell Oil Corp., 365 So.2d 1285 (La. 1979). (A building owner is strictly liable for damage caused by the defective condition of the premises regardless of whether he is ignorant of the condition and reasonably could not have detected it. C.C. Art. 2322).
The underlying reason for the owner's or guardian's strict liability is that the person to whom society allots the supervision, care or guardianship (custody) of *390 the risk-creating person or thing should bear the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. Loescher v. Parr, supra; See Olsen v. Shell Oil Corp., supra n. 13; Starck, The Foundation of Delictual Liability in Contemporary French Law, 48 Tul.L.Rev. 1043 (1975); See Comment, Article 2322 and the Liability of the Owner of an Immovable, 42 Tul.L.Rev. 178 (1967)." Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 116 (La.1986)
A vice or defect is defined as a condition of a thing which creates an unreasonable risk of injury to another. Halphen v. Johns-Manville Sales Corp., supra; Entrevia v. Hood, 427 So.2d 1146 (La.1983); Sumner v. Foremost Ins. Co., 417 So.2d 1327 (La.App. 3rd Cir.1982); Goudchaux v. State Farm Fire & Cas. Co., 407 So.2d 1317 (La.App. 3rd Cir.1981), writ den., 412 So.2d 1114 (La.1982). The vice or defect must be of such a nature as to constitute a dangerous condition which would reasonably be expected to cause an injury to a prudent person using ordinary care under the circumstances. Koppie v. Commercial Union Ins. Co., 478 So.2d 179 (La.App. 3rd Cir.1985), writ den., 479 So.2d 922 (La. 1985).
A defendant cannot be held responsible for all injuries resulting from any risk from his own things or things in his custody, only those caused by an unreasonable risk of harm to others. Lewis v. Oubre, supra; Entrevia v. Hood, supra. As we said in Lewis v. Oubre:
"The activities of a defendant for which he may be held liable without acting negligently are to be determined after a study of the law and customs, a balancing of claims and interests, a weighing of the risk of harm against the magnitude and likelihood of harm, and a consideration of individual and societal obligations. Entrevia v. Hood, supra; Langlois v. Allied Chemical Corporation, 258 La. 1067, 1084, 249 So.2d 133, 140 (La.1971)." Lewis v. Oubre, 461 So.2d 523, 525 (La.App. 3rd Cir.1984), writ den., 465 So.2d 735 (La.1985).
It is incumbent upon plaintiff to show by a preponderance of the evidence that his injuries were caused by a quality of the step-ladder that posed an unreasonable risk of harm to him. We now proceed to determine whether the jury and the trial judge's application of these legal principles and factual determination were warranted by the evidence.
The trial judge in his written reasons for judgment rendered on March 1, 1985, granting plaintiff's motion for judgment notwithstanding the verdict, stated that:
"It is unrebutted that neither the plaintiff nor Blalock were aware of the danger presented by the ladder. Mr. Blalock testified that there appeared to be nothing wrong with the ladder, there were no visible cracks or defects visible and that he and the plaintiff had never used this or a similar ladder before. Plaintiff testified that it appeared to be a regular ladder and that he was not given any warning or told that the ladder was weak or defective. He further stated that he had never used a ladder similar to the one in question. Both plaintiff and defendant's experts testified that it was a normal looking step ladder and nothing to indicate that it was inherently dangerous. The record is void of any evidence that would tend to show subjective knowledge or appreciation of any danger on the part of the plaintiff. Assumption of risk is not available as an affirmative defense when one is exposed to an unknown danger or hidden defect. The only favorable evidence existing on behalf of the defendant is that the plaintiff did voluntarily ascend the first two or three steps of the ladder but this is not sufficient to uphold the defense of assumption of the risk. Accordingly, plaintiff's motion to grant a judgment not withstanding the verdict is granted." (Emphasis added.)
In this case, plaintiff failed to produce any evidence which would indicate that the ladder from which he fell had a *391 vice or defect in its construction or design. Plaintiff produced one witness at trial to testify as to the condition of the ladder, Dr. Dale Carver, a retired professor of engineering and a consultant at the time of trial. Dr. Carver was accepted by the court as an expert in the field of theoretical and applied mechanics and also in the field of ladder failures. Dr. Carver performed no tests on the step-ladder, but merely conducted a visual examination of the step-ladder. Although Dr. Carver testified that the use of the step-ladder on a construction site or in roofing a building was dangerous, he also testified that the step-ladder itself was free of defects, as evidenced by the following excerpt taken from the trial transcript:
ATTORNEY: "All right. In ... insofar as the manufacturer was concerned at the time this ladder was sold and put on the market it met all of the Standards and it had no ... either design or manufacturing defects in it as far as you can tell?"
DR. CARVER: "I believe that's correct. Properly used in a kitchen somewhere the accident would not have occurred."
It was Dr. Carver's opinion that the accident occurred when plaintiff, while carrying the bundle of shingles, swayed or shifted, creating a lateral load of which the step-ladder was incapable of sustaining. As Dr. Carver stated, "[i]t was just the wrong tool at the wrong place at the wrong time." Although Dr. Carver testified that he believed that the step-ladder should have contained additional warning labels and additional bracing, he also testified that he was almost certain that the step-ladder, at the time that it was manufactured and put on the market, met all of the standard requirements and underwriting requirements.
Mr. Stephen Teleshak, a witness for defendant, was accepted by the court as an expert in metallurgical engineering. Mr. Teleshak's testimony basically corroborated Dr. Carver's opinion that the accident occurred due to plaintiff swaying or shifting on the ladder while carrying the bundle of shingles, as evidenced by the following testimony:
ATTORNEY: "Now, with reference to the failure that occurred here, I believe you said that it was your opinion that it was due to an overload. Would you explain that to the jury?"
MR. TELESHAK: "The fact that we have a ductile fracture indicates that this material was subjected to a load exceeding its yield strength and that in itself is ... is an overload because it exceeded the working load of two hundred pounds that ... that ... the load on ... on that leg exceeded eight hundred pounds which resulted in the separation, the break and the buckling."
ATTORNEY: "Okay. Now, did you find in your examination of the fractures and buckling or anything any defect in the design of ... of ... not in the design but in the materials which went in to make up this ladder so that it would carry such a load as that?"
MR. TELESHAK: "No, sir, I ... the fracture indicates it was ductile and there was ... the workmanship on it was satisfactory. I saw ... I saw nothing unusual, abnormal about the ladder."
ATTORNEY: "Okay. Now, would you come around and read to the jury what this label over here says?"
MR. TELESHAK: "It says a Sears ... in fact up here in ink it says 5 foot and then apparently it has the Model Number, a Serial Number, which is not legible but the label reads `Sears Step Ladder, Household Duty, For Occasional Light Household Use and Light Weight Climbers. Meets AMSI Specification Standards.' And then, of course, it goes into detail ... detail on precautions from the safety standpoint."
* * * * * *
ATTORNEY: "Then using the hypothetical question that I just asked you about Mr. Ducote [plaintiff] being on the third step and carrying the shingles and so forth, it would not have *392 been the ladder but the movement of Mr. Ducote [plaintiff] which placed that dynamic stress on those legs?"
MR. TELESHAK: "This is the term ... yes, sir, this is the term I used. Unusual abnormal application ... load application. That ... that would apply. The shifting of the load and ... and falling on it."
The step-ladder itself, which was clearly labeled as being a household ladder intended for light household duty and lightweight climbers, was itself free of vice or defects in its construction and design, as testified to by both plaintiff's and State Farm's expert witnesses and by plaintiff and Blalock. After conducting a careful review of the evidence in the record, with our focus on a balancing of claims and interests, a weighing of the risk of harm against the magnitude and likelihood of harm, and a consideration of individual and societal obligations, we cannot find that the five foot aluminum step-ladder, designed and constructed for use within a home, posed an unreasonable risk of harm of injury or could be reasonably expected to cause an injury to a prudent person using ordinary care under the circumstances. The magnitude and likelihood of harm presented by the step-ladder, when used by a prudent person exercising ordinary care under the circumstances, does not outweigh the social utility and benefit to society of such a step-ladder. The facts of this case indicate that the magnitude of the risk imposed, and the gravity of the harm threatened, are nominal in comparison with that of other risks presented by things and objects in our society. Lewis v. Oubre, supra. Even though use of a step-ladder may in fact be dangerous, we do not find that such danger was of a magnitude that it would be "unreasonably dangerous." Since the plaintiff has not proven that the step-ladder presented an unreasonable risk of harm, he cannot recover under strict liability. For the above reason, we conclude that the finding of the jury and the trial court that the ladder created an unreasonable risk of harm to plaintiff is manifestly erroneous and clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Company, 283 So.2d 716 (La. 1973).
Since we find that State Farm's first assignment of error requires a reversal of the trial court judgment, we do not address the other assignments of error made by appellant.
For the foregoing reasons the judgment of the trial court is reversed and judgment is hereby rendered in favor of State Farm and against plaintiff dismissing plaintiff's suit as to State Farm with prejudice, at his cost. All costs of this appeal are taxed against plaintiff-appellee.
REVERSED AND RENDERED.
STOKER, J., concurs and assigns written reasons.
STOKER, Judge, concurring.
I certainly concur in the majority holding that appellant is not liable under LSA-C.C. art. 2317 on the basis of Louisiana's strict liability concept. There was no defect in the thing. The stepladder was admittedly sound and contained no defect either in design, construction or materials. All that has been shown is the misuse of the stepladder. It was put to a use outside of its intended normal use. This suggests negligence on the part of Blalock which the jury might possibly have found had the trial judge not ruled out that basis of liability in instructing the jury. In any event, under the manifest error rule we would necessarily be required to find the trial judge's negligence ruling clearly wrong. The plaintiff has apparently acquiesced in that ruling and lays its case entirely under strict liability.
The majority opinion excellently reviews and applies the strict liability principles which have been recently developed in the jurisprudence, particularly Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). Although the Halphen case is a product liability case, it does review extensively principles relating to strict liability for harm caused by things. In such cases *393 it is basic, I think, that there be a vice or defect in the thing. While the majority cites cases for the proposition that a vice or defect is defined as a condition of a thing which creates an unreasonable risk of injury to another, there nevertheless must be a vice or defect in the thing. A thing might contain a vice or defect which would not present any risk of injury. For example, an automobile with a dent in its body would present no risk of harm, but defective brakes or slick tires would present such a risk. Thus, in applying the definition, a vice or defect must come first; then it should be determined whether or not the vice, defect or condition presents an unreasonable risk of harm to others.
In the case before us the jury found that a stepladder without vice or defect did present an unreasonable risk of harm or injury to Kenneth Ducote. In the manner used (or misused) the stepladder apparently did present an unreasonable risk. However, the use or provision of the stepladder by Blalock presented a question of negligent conduct on his part, not strict liability, for harm caused by a thing under his control. In my opinion this analysis requires a reversal of the trial court's judgment. In an excellent and commendable manner the majority makes a sophisticated balancing of interests analysis, following the jurisprudence it cites. The majority analysis arrives at the result of rejecting plaintiff's claim and a reversal of the trial court judgment. To me it would be sufficient to base the result on the absence of any vice or defect in the stepladder itself which presented an unreasonable risk of harm or injury.
NOTES
[*] Judge Ronald D. Cox of the Fifteenth Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] Blalock made no appearance in this suit as a party defendant, either in person or through counsel, and plaintiff's suit was subsequently dismissed as to him, without prejudice, after the trial of this matter was completed.