990 So.2d 383 (2007)
Larry J. CLEMENTS, Jr.
v.
Richie N. CLEMENTS.
2060044.
Court of Civil Appeals of Alabama.
August 31, 2007.
Rehearing Denied October 19, 2007.
Certiorari Denied March 14, 2008 Alabama Supreme Court 1070238.
*385 Mari Morrison, Birmingham, for appellant.
Gerard J. Durward and G. John Durward, Jr., of Durward & Cromer, Birmingham, for appellee.
THOMAS, Judge.
After 23 years of marriage, Larry J. Clements ("the husband") and Richie N. Clements ("the wife") were divorced on August 3, 2006. The parties had two children, ages 17 and 6 at the time of trial in this matter. After an ore tenus proceeding, the trial court entered a judgment divorcing the parties, awarding custody of the children to the wife, granting the husband visitation with the children, and requiring the husband to pay $1,473 per month in child support.[1] Additionally, the husband was ordered to pay for the children's medical insurance and for the children's noncovered medical expenses.
Regarding alimony and the division of the parties' marital property, the court ordered as follows: (1) the husband was required to pay the wife $1,500 per month as periodic alimony and the sum of $200,000 as alimony in gross, which was to be paid in installments of $700 per month; (2) title to the parties' Nissan Pathfinder automobile was vested in the wife for the benefit of the parties' 17-year-old son, but *386 the husband was ordered to make any payments of indebtedness on the automobile and to maintain insurance on the automobile until it was paid in full; (3) the wife was awarded the parties' 2003 model year GMC Yukon sport-utility vehicle and the parties' 2005 model year Mini Cooper automobile; (4) the husband was awarded the parties' 1991 model year Volvo automobile; (5) the husband was ordered to be responsible for all the parties' debt incurred during the marriage except for the debt associated with the parties' Target Visa account, which the court determined to be the wife's responsibility; (6) the marital residence was awarded to the wife, and she was ordered to be responsible for the first mortgage on the house and the husband was ordered to be responsible for the second mortgage on the house; and (7) the husband was awarded his business and its assets and liabilities.
Regarding items of personal property, the court's order awarded each party the respective items of personal property in their possession, which implicitly included each party's retirement accounts. However, several items of personal property, including tools and a bicycle, were awarded to the husband, and the husband's firearms were specifically awarded to the wife.
The court additionally ordered the husband to maintain his life-insurance policy and to keep the wife as the named beneficiary, awarded the wife her life-insurance policy, and ordered the husband to pay the wife's attorney fees in the amount of $15,000.
Finally, the court determined that the husband was in contempt for failing to pay the proper amount of alimony and automobile payments on the Mini Cooper automobile, which he had been ordered to pay pursuant to a pendente lite order. The court held that the husband owed $11,580 in alimony through March 2006 and $1,695 for automobile payments on the Mini Cooper automobile.
The husband appeals, raising six issues. The husband claims that the trial court: (1) inequitably distributed the parties' marital assets and liabilities; (2) erred in attributing $9,000 in monthly gross income to the husband; (3) erred in its child-support calculation; (4) erred by failing to enter a final judgment distributing all the parties' marital property; (5) erred in asserting jurisdiction to award certain property; and (6) erred in finding the husband in contempt.

Undisputed Evidence
The undisputed evidence at trial was as follows. The wife was approximately 41 years old at the time of the trial and had a high school diploma. She had attended beautician school after high school, but during the marriage she mostly worked in clerical positions. The husband was 41 years-old at the time of the trial and is an automobile mechanic who, for most of the marriage, worked for Crown Automobile. He worked at Crown Automobile for 17 years. However, in 2001, the husband began his own automobile-mechanic business called The Mercedes Doctor, Inc. ("the business"), a corporation in which the husband owned all the shares of stock. Eventually, in 2002, the husband left Crown Automobile to work full-time in his own business.
The wife also worked in a clerical and administrative position at The Mercedes Doctor, helping the husband to start the business. She handled the finances and inventory of the business, and she ran the office while the husband and his hired mechanics worked in the repair shop. By the time the divorce action was initiated, there were two additional female employees working in the office with the wife and one mechanic working in the repair shop with the husband. Even though the wife *387 was listed as the vice-president of the corporation, she owned no stock and did not receive a paycheck for her work.
The parties' marital property included a house that was purchased for $146,000 and that is still subject to a first and second mortgage. The parties also purchased a building for the business that cost $148,000 and is also subject to a mortgage. The business checking account, according to the testimony at trial, had approximately $20,000 in available funds.
Additionally, the husband had a 401(k) retirement account from his employment at Crown Automobile that was worth, shortly after the wife filed for divorce in June 2005, approximately $50,000,[2] and the wife had a 401(k) retirement account with a previous employer that was worth approximately $4,500.
The evidence indicated that the business had a gross profit of approximately $120,000 per year. The 2003 GMC Yukon sport-utility vehicle had been purchased with funds from the business and title had been placed in the husband's name.

Disputed Evidence
At trial, the parties disputed the value of the marital property. The wife estimated the marital residence to be worth $225,000, subject to a first mortgage of approximately $70,000 and a second mortgage of approximately $39,400. The husband testified that he thought the balance remaining on the first mortgage was approximately $60,000. The wife also claimed that the value of the building used for the husband's business was $300,000,[3] subject to a mortgage of approximately $128,000, while the husband valued the business building at approximately $160,000, subject to a mortgage of $125,000.[4]
The wife valued the business inventory, using an inventory list that she had printed out when she left the business after the parties separated, at a wholesale value of approximately $671,513 and at a retail value of $900,914. The wife also claimed that, at the time she left the business, the husband had over $52,000 in a safe located at the business.
The husband claimed that the wholesale value of the business inventory was much less than $600,000 and that the inventory at a place like Crown Automobile was only $1.1 million.[5] Rebecca Poe, an employee of the business who is in charge of inventory and accounting for the business, testified that she had performed an inventory update after the wife had left the business *388 and that there were multiple mistakes in the inventory spreadsheet and that her new calculations for inventory were much lower than the wife's submitted inventory calculations. Poe testified regarding the inventory spreadsheet, printed just before Poe conducted the updated inventory analysis, that showed a wholesale value of the business inventory at $426,148.74. After conducting her own inventory check, Poe testified that the updated inventory spreadsheet, dated November 23, 2005, showed an inventory with a wholesale value of approximately $103,241.47  over $300,000 less than the previous inventory records reflected.
The husband also testified that the safe at his business did not contain, and never had contained, $52,000, as claimed by the wife. Rather, he claimed that it never contained more than $10,000 and that, at the time of trial, it contained only about $1,000.
The wife testified that the husband drew a net income from the business of $2,600 per month, but the wife testified that he also gave her an additional $2,500 to $3,500 per month for various family expenses, plus additional money if she needed it. Further, the wife claimed that credit-card payments, automobile payments, and automobile-insurance payments for the parties' personal and business use were always paid out of the husband's business account. She testified that the business account was used many times to pay for meals, vacations, and other personal expenses.
The husband denied giving the wife additional payments outside the paychecks he received; he claimed that the business account was used to pay for business expenses only. According to the husband's tax returns for 2003, 2004, and 2005, he earned an average of approximately $45,600 annually from the business. However, a financial statement the husband signed in connection with a business-loan application from Union State Bank in 2003 showed that he claimed an income of $102,000.
Dennis Cameron, the accountant for the business and a certified public accountant, testified that he prepared the year-end statements and taxes for the business. He testified that he received copies of all checks, receipts, and bank statements necessary to prepare the year-end statements and taxes, and that he primarily dealt with the wife while the parties were married. Cameron also testified that, on occasion, personal debts paid from the business account were shifted to show income to the husband. Cameron testified that he did not, however, have access to credit-card bills and checks that had not been processed through the business account.
The wife presented evidence at trial indicating that her monthly household expenses were $10,277.39. She testified that she had medical debt beyond what her insurance covered; credit-card debt of approximately $17,141; and personal debts to various individuals totaling approximately $19,100, including a debt of $13,950 owed to her father.
The husband challenged the monthly expenses claimed by the wife. He challenged, among other things, a $500 allotment for a maid when, he said, the parties had never used a maid when they were married; her claim of $800 a month for groceries; and her claim of $550 a month for eating out. The husband also claimed that the wife inappropriately included in her monthly budget a $100 item for yard work when the parties have a riding lawn mower and a push mower at the marital residence and a 17-year-old son who is capable of mowing the grass.
The husband also claimed that the parties' Credit Union Visa credit card had had *389 only a $5,000 balance when the parties separated, but that it had a $10,000 balance at the time of trial. The wife admitted to running up the balance of that credit card since the parties' separation, but she claimed that she had been forced to incur personal and credit-card debt due to lack of alimony support from the husband.
The husband testified that the 2003 GMC Yukon sport-utility vehicle had been purchased for the business and had been used primarily for that purpose and that the 2005 Mini Cooper automobile had not been intended as a gift to the wife but had simply been purchased in her name for her personal use. The wife, on the other hand, testified that the GMC Yukon was primarily utilized as her personal vehicle, and that the Mini Cooper vehicle was a Christmas present from the husband.
The wife also testified that she had applied for employment since the parties' separation and since leaving the business but that she had not been able to find employment. However, she admitted that she had received an offer of employment from a friend of the husband's who does automobile-repair work, but she stated that she had declined that offer due to health reasons and that she had not been offered any other jobs since that time.
The wife testified that she had been having problems with her throat and sinuses and that she recently had had surgery to remove a growth on the back of her throat. She also claimed that she had been in the hospital for a hysterectomy and for several ovarian cysts.
After a pendente lite hearing on temporary child support and alimony, the trial court ordered that the husband pay the wife $1,176 per month in child support and $2,000 a month in temporary alimony. The order also required the husband to make the $565-per-month payments on the Mini Cooper automobile in the wife's possession.
At the time of trial, the husband had paid all the child-support payments but not all the alimony and Mini Cooper payments required by the pendente lite order. The wife claimed that the husband owed her approximately $11,580 in alimony through March 2006 and $1,695 for the Mini Cooper automobile payments through April 2006. However, the wife acknowledged that she did not calculate or take into account a $1,500 payment that the husband had made for March 2006.
There was extensive testimony at trial regarding a relationship between the husband and another woman. Although the woman was a friend to both the husband and the wife before the parties separated, the wife claimed that the husband began an adulterous affair with the woman.[6] The husband testified that, after the parties separated, he and the woman became close friends but had never been sexually intimate.
The testimony and evidence at trial established that the husband and the woman had eaten together many times and had taken several trips together and that the husband had purchased gifts, including a bicycle and clothing, for the woman.

Analysis
This court's well-established standard of review in divorce proceedings is that a divorce judgment based on ore tenus evidence is presumed correct, and such a judgment will be reversed only when it is unsupported by the evidence so as to be plainly and palpably wrong. See Harmon v. Harmon, 928 So.2d 295 (Ala.Civ.App.2005)(citing Baggett v. Baggett, *390 855 So.2d 556, 559-60 (Ala.Civ.App. 2003)).
It is also well established that, in the absence of specific findings of fact, an appellate court will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous. New Props., L.L.C. v. Stewart, 905 So.2d 797 (Ala.2004); Ex parte Bryowsky, 676 So.2d 1322 (Ala. 1996); and Nave v. Nave, 942 So.2d 372 (Ala.Civ.App.2005).

I. Alimony & Property Division

An award of alimony and the division of marital property are considered together and are matters within the discretion of the trial court. Carter v. Carter, 934 So.2d 406 (Ala.Civ.App.2005)(citing Ex parte Durbin, 818 So.2d 404, 408 (Ala. 2001)). Because those matters are interrelated, the entire judgment must be considered in determining whether the trial court exceeded its discretion as to either issue. See Harmon, supra. Furthermore, a property division does not have to be equal, but it must be equitable, J.H.F. v. P.S.F., 835 So.2d 1024 (Ala.Civ.App.2002), and it must be "supported by the particular facts of the case," Ex parte Elliott, 782 So.2d 308, 311 (Ala.2000). The determination of what is equitable is a matter of discretion for the trial court. See Carter, supra.
Conflicting evidence and testimony was presented at trial regarding the value of the marital assets. The largest of the marital assets was the business. The wife claimed that the wholesale value of the business inventory was approximately $671,513, while the husband claimed that it was approximately $103,241.
The trial court, as fact-finder, could have determined that the wife's calculations were the correct ones upon which to base its alimony and property-division awards. For example, the wife's inventory estimates were based on a report that had been printed from the computerized inventory-tracking system that the business used in its regular day-to-day operations and in determining its yearly tax assessments. The husband countered that those estimates were inflated with double entries and false entries. The trial court was in the best position to weigh the credibility of the witnesses and the corresponding evidence, and it was vested with the discretion to believe the wife's testimony and to accept her inventory evidence as being the more reliable evidence of the value of the business assets. See Harmon, supra.
Assuming that the trial court resolved the conflicting evidence regarding the value of the parties' major marital assets in the wife's favor, the property division breaks down as follows:
The wife received the marital residence, worth approximately $225,000, an alimony-in-gross award of $200,000, and her 401(k) account worth $4,500. Additionally, the wife was awarded the 2003 GMC Yukon sport-utility vehicle worth $17,500 and the 2005 Mini Cooper automobile worth $26,000. The wife also received the benefit of the husband's being required to pay her personal debts in the amount of $19,100,[7] credit-card debt in the amount of $15,493,[8] and $15,000 in attorney fees. The only debts the wife was ordered to be *391 responsible for in the divorce judgment were the first mortgage on the marital residence in the amount of $70,000 and the Target Visa credit-card debt in the amount of approximately $1,648. Thus, the divorce judgment awarded the wife approximately $450,945 of the major marital assets.
The divorce judgment awarded the husband, in addition to a few items of personal property, his retirement account worth approximately $51,309, his 1991 Volvo automobile worth $750, and the business and all its assets and liabilities, which,  assuming the trial court accepted a conservative estimate of the wife's valuation of the business assets  had a value of $901,413.[9] The debts assigned to the husband were the second mortgage on the marital residence, which was approximately $39,400; credit-card debt in the amount of $15,493; the wife's personal debts totaling $19,100; attorney fees for the wife in the amount of $15,000; and an alimony-in-gross award of $200,000. Thus, the husband's award of the major marital assets totaled approximately $664,479.
The total value of the relevant marital assets and liabilities awarded to the husband and the wife at the time of the divorce was approximately $1,115,424. This amount includes, among other things, the equity in the marital residence, both the 2003 GMC Yukon sport-utility vehicle and the 2005 Mini Cooper automobile; both parties' retirement accounts; the value of the business according to the testimony and evidence at trial; and the marital debt, which includes approximately $17,141 of credit-card debt, the wife's attorney fee of $15,000, and the wife's personal debts in the amount of $19,100. The wife's award in the amount of $450,945 gives her approximately 40% of the marital estate, and the husband's award in the amount of $664,879 gives him approximately 60% of the marital estate. Therefore, when using the wife's valuations, the trial court's division of the marital estate is not plainly or palpably wrong or inequitable. See Carter, supra; J.H.F., supra. See also Wells v. Wells, 567 So.2d 361 (Ala.Civ.App.1990)(affirming trial court's division of marital property of 65% to the husband and 35% to the wife when the husband's business was the major marital asset).
According to our decision in Carter, the factors to be considered by a trial court when determining matters of alimony and property division are "the parties' respective ages, earning capacities, and future prospects; the parties' standard of living and stations in life; the length of the marriage; the conduct of the parties in regard to the cause of the divorce; and the source, value, and types of marital properties." 934 So.2d at 409.
In the present case, based on the evidence and the testimony of the parties, the *392 trial court could have reasonably determined that the husband's earning capacity was greater than the wife's due to his experience as a mechanic and the fact that he owns his own automobile-repair business. The trial court could have also determined that because the wife had helped the husband to start and build up his business, the wife deserved a substantial portion of the fruits of the venture up to the time of divorce.
Furthermore, even if the trial court had determined the value of the business to be somewhere between the amounts proffered by the husband and the wife  thus reducing the value of the husband's award proportionately  the trial court could have considered the husband's alleged adulterous behavior to be a significant factor contributing to the breakdown of the marriage. See Ex parte Drummond, 785 So.2d 358 (Ala.2000). In accordance with Ex parte Drummond, supra, a trial court is entitled to consider inferences of adultery when fashioning a property division, even when, as in the present case, the trial court made no specific finding of fault in the divorce judgment. Id. See also Slater v. Slater, 587 So.2d 376 (Ala.Civ.App.1991)(citing White v. White, 278 Ala. 682, 180 So.2d 277 (1965)). Therefore, the trial court could have considered inferences of adultery or other marital misconduct by the husband in fashioning its property division. Carter, supra; Drummond, supra.
The husband argues that the $200,000 alimony-in-gross award was excessive because, he claims, he does not have unencumbered assets that could be liquidated to pay that alimony obligation. Citing Ex parte Hager, 293 Ala. 47, 299 So.2d 743 (1974), he argues that his largest asset, the business inventory, is necessary for the ongoing operation of the business and that an alimony-in-gross award must be payable out of the present estate of the paying spouse as it exists at the time of the divorce.
Although an alimony-in-gross award is payable from the present estate of the paying spouse, the authority cited by the husband does not stand for the proposition that an alimony-in-gross award must be no larger than the liquidated value of the payor's present estate. Rather, Hager holds that an alimony-in-gross award may "represent a division of the fruits of the marriage where liquidation of a couple's jointly owned assets is not practicable." Hager, 293 Ala. at 54, 299 So.2d at 749; See also TenEyck v. TenEyck, 885 So.2d 146, 151 (Ala.Civ.App.2003)(quoting Ex parte Hager, supra). Further, a trial court may require that an alimony-in-gross award be paid in installments, Hager, 293 Ala. at 54, 299 So.2d at 749, and the installment method of payment is directly applicable when a major marital asset is an ongoing business. See Wells v. Wells, 428 So.2d 88 (Ala.Civ.App.1983). In Wells, this court upheld a trial court's alimony-in-gross award that was payable over an 11-year period because a lump-sum payment of the alimony-in-gross award could have crippled the husband's business by forcing a sale of the business assets.
This court cannot hold that the trial court's award of alimony and the division of marital property was plainly or palpably wrong, because there was evidence in the record from which the trial court could have reasonably determined that the alimony and division of marital property was equitable under the circumstances of this case. Carter, supra; Wells, supra. It is well settled that a trial court is afforded a wide degree of discretion in dividing marital assets in a divorce proceeding; the only limitation is that the division of property must be equitable under the circumstances of the particular case. Further, it is the *393 trial court that determines what is equitable. TenEyck, supra (citing Cantrell v. Cantrell, 773 So.2d 487, 489 (Ala.Civ.App. 2000), and Ross v. Ross, 447 So.2d 812, 813 (Ala.Civ.App.1984)).
The husband argues that the trial court's award of alimony and division of marital property results in monthly expenses that are so burdensome to him that he will not be able to afford food or shelter. He argues that the trial court determined that he made $9,000 a month and that the trial court's award makes him responsible for $8,700 in monthly expenses. The husband claims that these expenses consist of the payment on the second mortgage on the marital residence; his child-support obligation; his periodic-alimony obligation; the alimony-in-gross installments; automobile payments; medical-insurance payments for the parties' children; and automobile-insurance payments. However, the only expenses established as fixed monthly expenses by the trial court's judgment were the husband's child support and alimony obligations and the expense of maintaining medical insurance for the parties' minor children.[10] The other monthly expenses or debts claimed by the husband are ones that can be paid off in their entirety in a lump sum.
Because the husband's argument on appeal regarding the excessiveness of his monthly expenses does not explain or provide any details as to how he arrived at the amount of his alleged monthly expenses, and due to the lack of evidence in the record regarding the husband's monthly expenses, we are unable to find support for the husband's contention that his monthly expenses are so burdensome as to render the trial court's alimony and marital-property award plainly or palpably wrong. See Harmon, supra; Nave, supra.

II. The Husband's Income

The husband claims that he makes approximately $4,333 per month and that the trial court's judgment attributing "at least $9,000" in monthly gross income to him is contrary to the evidence. On appeal, he argues that his tax returns for the years 2003 through 2005, along with the reports created by the accounting firm his business uses, show that his annual, and, thus, monthly, income is much lower than the $9,000-per-month determination of the trial court. The husband further argues that evidence was introduced indicating that the business uses a computerized inventory and that all of its accounting and other transactions are entered into a computer program and that his accountant, Dennis Cameron, produces financial reports and tax forms based on the information entered into the computer program.
Cameron testified at the divorce proceeding, however, that he does not audit the husband's business or verify that the numbers submitted to his accounting firm are accurate. Cameron testified that his company simply takes the numbers and documents provided to it and prepares financial reports and tax forms based on those numbers. Therefore, Cameron's testimony adds little or no additional support for the husband's claims because Cameron's testimony regarding the accuracy of the financial reports and tax records of the husband are completely dependent upon the accuracy of the information provided to Cameron's accounting firm.
*394 The wife testified that the husband received two paychecks a month for a gross monthly income of approximately $4,000 ($2,600 monthly net income). However, she further testified that the husband had provided her with an additional $2,500 to $3,500 more per month for additional expenses and spending. The wife also testified that the husband's business account had been used to pay for many of the parties' personal expenses, including meals, vacations, personal credit-card debts, and automobiles intended primarily for personal use. A financial report was also introduced into evidence showing that the husband had claimed on a bank-loan application in 2003 that he earned $102,000 a year, which translates into approximately $8,500 a month.
The ore tenus presumption applies to "`"disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence.'" Friedman v. Friedman, 971 So.2d 23, 28 (Ala.2007)(quoting Born v. Clark, 662 So.2d 669, 672 (Ala.1995)). The trial court was in the best position to resolve the disputed issue of the husband's monthly income. Because there was evidence in the record to support the trial court's decision, we find no error as to this issue. See Harmon, supra.

III. Child Support

The husband argues that the trial court's child-support determination was in error because, he alleges, the trial court improperly imputed income to the husband in the amount of $9,000, did not impute income to the wife based on her alleged voluntary unemployment and her receipt of alimony, and failed to consider medical-insurance payments that the husband has deducted from his paychecks. Because we have already held that the trial court did not exceed its discretion by determining that the husband's monthly income was $9,000, we do not discuss that issue further.
The trial court is afforded the discretion to impute income to a parent for the purpose of determining child support, and the determination that a parent is voluntarily unemployed or underemployed "is to be made from the facts presented according to the judicial discretion of the trial court." Winfrey v. Winfrey, 602 So.2d 904, 905 (Ala.Civ.App.1992). See also Rule 32(B)(5), Ala. R. Jud. Admin.
At the time of trial, the wife was not employed and had no income. The husband argues that the trial court should have imputed income to the wife because, he asserts, although she had the capacity to work, she was voluntarily remaining unemployed. The husband points out the fact that the wife was offered a similar job with an automobile-repair shop owned by a friend of the husband's but that the wife turned the job down.
However, the wife testified that she had been dealing with some health problems involving her throat and sinuses, that she had been in the hospital for a hysterectomy and several ovarian cysts, and that she had recently had surgery to remove a growth on the back of her throat. She claimed that she turned down the job offer from the husband's friend because, at the time, she was on "medical leave." The wife further testified that, since the parties' separation, she had applied for jobs at Alabama Power Company, Medical Center East, and various doctor's offices.
It was within the trial court's discretion to refuse to impute income to the wife. The trial court has the discretion to weigh conflicting evidence and to make findings as to whether or not unemployment is "voluntary" for the purpose of imputing *395 income. Winfrey, 602 So.2d at 905. Therefore, because there was evidence in the record indicating that the wife had been unable to find employment due to health reasons and unsuccessful job searches, the decision of the trial court not to impute income to the wife was not clearly erroneous or plainly wrong. Id.
The husband also argues that the periodic-alimony and alimony-in-gross awards should be included in the wife's "gross income," under Rule 32(B)(2)(a), Ala. R. Jud. Admin., which defines "gross income" to include "income from any source." However, alimony in gross is a form of property division and is not to be included in an "income" computation for the purpose of calculating child support. See Rimpf v. Campbell, 853 So.2d 957 (Ala. Civ.App.2002). Periodic alimony is also not considered income to the wife for the purpose of calculating child support. See Spears v. Spears, 903 So.2d 135 (Ala.Civ. App.2004). Rather, periodic alimony is intended for the sole purpose of the recipient spouse's support. Spears, 903 So.2d at 138 (citing Waltman v. Waltman, 528 So.2d 867, 868 (Ala.Civ.App.1988)).
Lastly, the trial court did not commit reversible error by failing to include the amount of health insurance paid by the husband on the CS-42 Child Support Guidelines Form. The husband was found to have 100% of the parties' gross income, and thus he was found to be responsible for providing 100% of the children's support. Additionally, the trial court, in a separate holding, ordered the husband to be responsible for the medical insurance of the parties' children. Therefore, because the health-insurance costs for the parties' children is required to be apportioned according to the parents' respective gross-income percentages, and then deducted from the obligor's share of the total child-support obligation, it would not have made a difference in the husband's child-support obligation if the trial court had included an allowance for the children's health-insurance costs in the child-support calculation. See Rule 32(B)(7)(c), Ala. R. Jud. Admin.

IV. Final Judgment as to All Property

The evidence from the record indicated that there was one, if not several, certificates of deposit, in both parties' names, that were pledged as security for the purchase of the business building. The husband claims that the trial court's divorce judgment did not address or make a disposition of ownership regarding those items of marital property. The husband also argues that, even though the names of both the husband and the wife were on the mortgages and the business loan, the judgment did not provide for a reasonable time-frame for the wife to remove her name from the business loan and for the husband to remove his name from the first mortgage on the marital residence. Therefore, the husband claims that the judgment is not final.
The husband's argument assumes that a judgment in a divorce proceeding is not final if the judgment does not dispose of all the parties' jointly owned property. This assumption is not correct. A final judgment of divorce does not necessarily have to dispose of all the parties' jointly owned property. See Fitts v. Stokes, 841 So.2d 229 (Ala.2002); Garrett v. Garrett, 521 So.2d 1337 (Ala.Civ.App. 1988); and Hammock v. Hammock, 867 So.2d 355 (Ala.Civ.App.2003). Rather, when a final judgment of divorce does not reference a specific asset, liability, or piece of personal or real property, jointly owned by the parties, the property remains unaffected by the judgment, and the ownership, along with the benefits and burdens thereof, remains as it was before the entry of the divorce judgment. Radiola v. Radiola, 380 So.2d 817 (Ala.1980); Miller v. *396 Miller, 391 So.2d 119 (Ala.Civ.App.1980); and McGuire v. Horton, 586 So.2d 9 (Ala. Civ.App.1991).
Therefore, the trial court's judgment of divorce was final, and any jointly owned property not disposed of in the judgment remains unaffected by the judgment. If any certificate of deposit reaches its maturity or is otherwise released as security for the loan on the business building, the certificate will be jointly owned by the parties and each will have a right to the proceeds of the certificate.

V. Jurisdiction as to Certain Property

The husband argues that the trial court lacked jurisdiction to award the wife the firearms that he had previously owned. The undisputed evidence indicated that the husband had been convicted in St. Clair County in 1999 of buying and receiving stolen property; therefore, he was unable to own or possess firearms. However, he claims that he retained the authority to dispose of the firearms or, in the alternative, that he had already made a disposition of the firearms.
However, parties to a divorce action submit themselves and their property to the equity jurisdiction of the trial court, and when the trial court hears the evidence ore tenus, its judgment is afforded a presumption of correctness. See Drummond v. Drummond, 466 So.2d 974 (Ala.Civ.App. 1985). The husband, at trial, asked the court to return the firearms to him; he made no mention or argument that he had already disposed of the firearms. Thus, there was evidence indicating that the husband had not disposed of the firearms, and it was within the trial court's discretion to decide which party should be awarded the firearms. Drummond, supra. Furthermore, the husband cannot argue for the first time on appeal that he had previously made a disposition of the firearms or that he had relinquished possession of them for a future disposition. See Crutcher v. Wendy's of North Alabama, Inc., 857 So.2d 82 (Ala.2003); and S.W.M. v. D.W.M., 723 So.2d 1271 (Ala.Civ.App.1998).
The husband also argues that the trial court improperly issued a garnishment against the business without making the business a party to the divorce proceedings. The record reveals that, although the garnishment was briefly referred to at trial, there was never any argument made before the trial court that, because the business was never made a party to the action, the court lacked personal jurisdiction over the business and, therefore, that the garnishment was improper. Again, because the husband failed to raise this issue at trial, the personal-jurisdiction argument is waived and this court will not consider it for the first time on appeal. See Rule 12(h)(1), Ala. R. Civ. P.; S.W.M., supra.

VI. Contempt

Finally, the husband argues that the trial court erred in finding him in contempt for failing to make all the required payments due pursuant to the court's pendente lite order. Citing Stamm v. Stamm, 922 So.2d 920 (Ala.Civ.App. 2004), and other cases, he claimed an inability to pay the required amounts as his defense to the trial court's contempt finding.
The inability to pay court-ordered alimony is a defense to contempt. Sexton v. Sexton, 935 So.2d 454, 460 (Ala. Civ.App.2006). "`"When the accused presents evidence that he is unable to pay the ordered amount, the burden o[f] proof is on the complainant to prove beyond a reasonable doubt that he can comply."'" 935 So.2d at 460 (quoting Sealy v. D'Amico, 789 So.2d 863, 866 (Ala.Civ.App.2000) (quoting in turn Watts v. Watts, 706 So.2d 749, 751 (Ala.Civ.App.1997))). However, *397 the determination of whether a party is in contempt is within the discretion of the trial court, and, unless the record reveals an "`abuse of that discretion or unless the judgment of the trial court is unsupported by the evidence so as to be plainly and palpably wrong, this court will affirm.'" Nave v. Nave, 942 So.2d at 377 (quoting Stack v. Stack, 646 So.2d 51, 56 (Ala.Civ. App.1994)). Furthermore, in Stamm, we held that a "trial court's determination that a party's failure to comply with a judgment is willful and not due to an inability to comply, when based on ore tenus evidence, will be affirmed if it is supported by one view of that evidence." 922 So.2d at 924.
There was evidence in the record from which the trial court could have found beyond a reasonable doubt that the husband did have the ability to make the pendente lite alimony payments. The husband had a business checking account with a balance, at the time of trial, of at least $20,000, a retirement account containing over $50,000, and some amount of cash on-hand at the safe located at his business. Those amounts far exceed the husband's pendente lite alimony arrearage. However, the husband failed to make all the required pendente lite alimony payments.
Therefore, because there were funds available from which the husband could have drawn in order to make the pendente lite alimony payments, we cannot hold that the trial court's judgment was "plainly or palpably wrong" or that the trial court exceeded the limits of its discretion by determining that the husband was in contempt for failing to make the required alimony payments. Stamm, supra.
However, the wife admitted that the exhibits she submitted showing the amounts owed and the payments made by the husband, per the pendente lite order, did not include an additional $1,500 payment by the husband in March 2006. Therefore, it is clear from the record that the trial court erred in its finding that the husband owed $11,580 in arrearage on pendente lite alimony payments through March 2006.

Conclusion
The judgment is affirmed in all respects except for that part of the judgment determining the husband's pendente lite alimony arrearage. That portion of the judgment is reversed, and the cause is remanded with instructions that the trial court recalculate the arrearage, giving the husband credit for the $1,500 payment he made in March 2006.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN and MOORE, JJ., concur.
BRYAN, J., concurs in the result, without writing.
NOTES
[1] In determining the amount of child support, the court found that the husband earned "at least" $9,000 in monthly gross income as opposed to the husband's contention that he earned only $4,333 in monthly gross income.
[2] The wife submitted a financial statement from the company managing the husband's retirement account that stated that the account was valued at $49,937.94 as of January 1, 2006. The husband submitted an exhibit at trial that stated that the value of the account was $51,309.07. No evidence was introduced regarding the value of the account at the time of the filing of the action, and no argument was made at trial or on appeal that the relevant value of a retirement account when determining the value of marital property is the value at the time of the filing of the action. See Smith v. Smith, 836 So.2d 893 (Ala.Civ. App.2002).
[3] The wife also claimed that the parties' jointly owned two certificates of deposit worth approximately $20,000  $25,000 and $40,000, respectively, that were pledged as security to purchase the business building.
[4] There is also a lot located behind the business building that the husband claimed he was renting from a friend. The wife testified that she was not sure whether the lot was rented, or whether it was being sold to the husband in monthly "rental" installments. The cost to use the lot was $500 a month.
[5] This court assumes that because the husband's testimony was in the context of the wholesale value of his business inventory, his testimony regarding the $1.1 million in inventory at Crown Automobile was also referring to a wholesale value.
[6] It is unclear from the record whether the wife was claiming that the husband began the alleged affair before or after the parties separated.
[7] The exhibit submitted by the wife, demonstrating the amount of her personal debts owed to various individuals, mis-stated the total amount of debt she owed as $18,300.
[8] The wife stated that most of the credit-card debt had been incurred after the parties separated because, she claimed, due to the husband's failure to pay pendente lite alimony, she had been forced to use credit cards to pay for certain necessary expenses.
[9] This figure includes $671,513, the wife's estimate as to the wholesale value of the business inventory; $172,000, the wife's estimate as to the value of the business building ($300,000), minus the amount the wife estimated the mortgage on that building to be ($128,000); $20,000, the balance of the business checking account at the time of trial; $1,000, the amount of cash the husband testified was in the business safe at the time of trial; $18,900, the husband's estimate as to the value of a Ford F-350 truck owned by the business; $10,000, the husband's estimate as to the value of a Pontiac Trans Am automobile owned by the business; and $8,000, the value of an automobile trailer owned by the business.

The value of the business discussed here does not include an additional $51,000 of cash that the wife claimed was in the safe when she left the business. However, this amount would only strengthen the wife's position that the distribution of marital property was equitable.
[10] There was evidence in the record indicating that the husband paid $738 per month for medical insurance for the children. This amount plus his $1,500 periodic-alimony obligation and his $700 monthly alimony-in-gross installment equals $2,938 in monthly expenses established by the trial court's judgment, which is much lower than the husband's claimed amount of expenses of $8,700 per month.